UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JACQUI SWANSON,          )
                           )
        Plaintiff        )
                           )
    v.                )      1:15-cv-383-GZS
                           )
CORRECT CARE SOLUTIONS, INC.,  )
                           )
        Defendant     )

**RECOMMENDED DECISION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff Jacqui Swanson asserts federal and state claims of disability discrimination in employment against Defendant Correct Care Solutions, Inc. The matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 31.) Following a review of the summary judgment record and after consideration of the parties' arguments, I recommend the Court grant Defendant's motion.

## I.   BACKGROUND FACTS

### A.   Defendant's Statement of Material Facts

Defendant Correct Care Solution (CCS) provides healthcare services to correctional institutions throughout the country. (Defendant's Statement of Material Facts (DSMF) ¶ 1, ECF No. 32.) During the relevant time period, CCS contracted with the Maine Department of Corrections (MDOC) to provide healthcare services to inmates at the Mountain View Correctional Facility in Charleston, Maine. (*Id.* ¶ 2.)

Kim Partridge was employed by CCS as the Health Services Administrator at the Correctional Facility. (*Id.* ¶ 3.) Jeffrey Morin was employed by the MDOC as the Superintendent of the Mountain View facility. Mr. Morin was responsible for, among other things, the safety and security of the inmates at Mountain View as well as the staff who worked at Mountain View. (*Id.* ¶ 4.)

On September 1, 2014, Plaintiff applied for a position with CCS as a Registered Nurse at Mountain View. As part of that process, Plaintiff completed an employment application and attached her resume.[1] (*Id.* ¶ 12.) The application form, which Plaintiff read, stated that the facility "would conduct a background investigation for purposes of issuing security clearance," and that in the event of an unsatisfactory finding, Plaintiff would be "denied a security clearance and any offer of employment [would] be withdrawn immediately, or [her] employment with CCS [would] be terminated." (*Id.* ¶ 13.) Plaintiff further "authorize[d] investigation of all statements contained in [the] application and agree[d] that if any material or willful misrepresentation or omission has been made [therein] or the results of an investigation are not satisfactory for any reason, any offer of employment made … by CCS may be withdrawn immediately, or … employment with CCS will be terminated immediately…." (*Id.* ¶ 14.)

On her application, Plaintiff stated that her nursing license had been placed on probation for substance abuse and was reinstated early due to successful treatment. (*Id.* ¶ 16.) Plaintiff has a history of addiction to narcotic medications and alcohol. (Pl.'s

---

[1] Plaintiff asserts that the application form contained only four spaces in which to describe prior employment. Plaintiff listed only her four most recent employers, and her resume included employment in the prior five years. (POSMF ¶¶ 18, 22.)

Statement of Additional Material Facts (PSAMF) ¶ 53, ECF No. 36.) From 2008 to present, Plaintiff has not used any narcotic medications except Suboxone as prescribed. (*Id.* ¶ 54.)

On September 9, 2014, Ms. Partridge interviewed Plaintiff for the Registered Nurse overnight shift position at Mountain View. (DSMF ¶ 24.) In that position, Plaintiff would be the only nurse on duty and would have keys to the medical cabinet, which contained controlled substances.[2] (*Id.* ¶ 25.)

As part of CCS's hiring process, Ms. Partridge attempted to obtain a copy of Plaintiff's nursing license. (DSMF ¶ 27.) Due to a problem with the Maine Board of Nursing website, Ms. Partridge was unable to view the complete history of Plaintiff's nursing license and the prior restrictions. (*Id.* ¶ 28.) Before Ms. Partridge extended an offer of employment to Plaintiff, Ms. Partridge had obtained a page from the Board of Nursing web site that showed two disciplinary actions, a Consent Agreement dated May 12, 2009, and a Board Order dated March 7, 2013. (PSAMF ¶ 73; Partridge Ex. 7, ECF No. 30-8.) Ms. Partridge could have obtained more information by contacting the Board, but did not do so. (DOSMF ¶ 28.) She was able to verify that Plaintiff had a valid nursing license at the time of the hiring process. (DSMF ¶ 29.) The MDOC did a criminal background check and reported to Ms. Partridge that the check did not preclude Plaintiff's employment at the Correctional Facility. (PSAMF ¶ 75.)

---

[2] Plaintiff states that narcotics are not standard medications at the Correctional Facility, and would only be administered if an inmate had surgery and was prescribed narcotics for pain control. (DOSMF ¶ 25.)

On September 23, 2014, Ms. Partridge offered Plaintiff a position as a Registered Nurse at Mountain View. (*Id.* ¶ 30.) The offer letter, which Plaintiff accepted and understood, specifically stated that she "must obtain and keep a valid security clearance throughout [her] employment with CCS in order to be eligible for continued employment with CCS." (*Id.* ¶ 31.) Plaintiff's job description also stated that the position required Plaintiff to maintain a security clearance. (*Id.* ¶ 32.) The Security Policy in the Team Member Manual further stated that Plaintiff's employment was "contingent upon initial and continued security clearance as defined by institutional policies" and that "[a]ny CCS team member who loses security clearance will no longer be employable by CCS and will be terminated." (*Id.* ¶ 33.) Plaintiff did not have any performance issues during her employment with CCS. (*Id.* ¶ 34.)

Relatively soon after Plaintiff was hired, based on certain information received by Ms. Partridge and Mr. Morin, Mr. Morin asked a member of law enforcement to obtain some public records regarding Plaintiff. Through this effort, Mr. Morin learned that Plaintiff's nursing license had been suspended due to drug diversion when Plaintiff was employed by a previous employer. (*Id.* ¶ 38.)

On October 14, 2014, Mr. Morin spoke with Ms. Partridge about the drug diversion information he obtained. Ms. Partridge informed Mr. Morin that Plaintiff had not disclosed her history of drug diversion when she applied for the position with CCS or during the interview process. (*Id.* ¶ 39; DOSMF ¶ 39.) At her deposition, Plaintiff recounted her conversation with Ms. Partridge about Plaintiff's history regarding the diversion of drugs as follows:

Q. Okay. And so when – when Kim Partridge interviewed you, you didn't say – you didn't say anything to her about drug diversion either?

A. No.

Q. Okay. All right. On –

A. Well, actually, I think I did because she – we talked about why my license was suspended.

Q. Okay. What –

A. I did talk to her about diversion. We didn't talk about any specific place. She didn't ask and I didn't say.

Q. What specifically did you say to her?

A. I do believe it was vague in the sense that I just said, you know, I had struggled and lost some jobs, the Board of Nursing found out about it.

Q. Okay.

A. So it was very – but she was aware that it was reported to the Board of Nursing that I was misappropriating medications.

Q. Did you – did you tell her that you had been accused of diverting drugs from a patient?

A. I can't say I used those words direct – that exactly, no.

Q. Okay. As you sit here today, can you say under oath that you used the word diverted drugs? The words diverted drugs?

A. No. I did not – I don't recall using the word diversion. I might have, I don't re – I can't say specifically, no.

Q. Okay. You just told her that your license had been suspended or revoked or?

A. Put on a probationary period because it was never suspended.

Q. Okay.

A. It was never revoked.  For using drugs specifically is what I said.

Q. Okay. But not – you didn't say for stealing drugs?

A. No, I didn't.

(Plaintiff Dep. 89 – 91.)

Q. Okay. So when you applied for your employment with Correct Care Solutions you didn't tell Kim Partridge about the board's investigation with regard to the Mercy incident?

A. No.

Q. Okay.

A. Under the impression I didn't need to.

Q. And you didn't tell her that the Board of Nursing had issued a letter of concern?

A. Nope.

Q. And you didn't tell her that you had diverted drugs from Mercy?

A. Nope.

(*Id.* at 129 – 30.)

Mr. Morin provided Ms. Partridge with a copy of the Consent Agreement between Plaintiff and the nursing board.  (DSMF ¶ 40.)  In the Consent Agreement, Plaintiff admitted that she had diverted Dilaudid, a controlled medication, from Brentwood.[3]  (*Id.* ¶

---

[3] Plaintiff asserts that she was informed by an officer of the Board of Nursing that, when responding to an employer about her history, she should answer the employer's questions, but she did not need to disclose any of her information unless she was asked specifically, in which case she should answer honestly.  (*Id.* ¶¶ 59 – 60.)  On March 8, 2013, the Board of Nursing notified Plaintiff that her probationary period was terminated early due to her compliance with the Consent Decree.  (*Id.* ¶ 61.)

41.)  Mr. Morin expressed his concern about what he perceived to be Plaintiff's failure to disclose her history of drug diversion (theft of prescription medication from a prior employer) and her dishonesty during the interview process.  (*Id.* ¶ 42.)  In a memorandum, he wrote, "I am not comfortable with her at Mountain View but if the decision is made to keep her on board I would like to discuss protocols to keep a tight check on things." (PSAMF ¶ 77; Morin Aff. Ex. 1, ECF No. 32-1.)  He also wrote: "I am more concerned that most of these issues had to come out from others; not as a result of her being forthcoming with us."  (DRS ¶ 77; Morin Aff. Ex. 1.)

On the same day (October 14, 2014), Ms. Partridge asked Plaintiff to leave Mountain View until an investigation could be completed and after the MDOC assessed the situation.  (DSMF ¶ 43.)  Before Plaintiff was asked to leave the facility, she met with Ms. Partridge and the medical director, during which meeting Ms. Partridge asked Plaintiff if she was taking Suboxone, and Plaintiff responded that she was.  (PSAMF ¶ 78.)

On October 15, 2014, the MDOC revoked Plaintiff's security clearance and issued a permanent gate stop.  (*Id.* ¶ 44.)  According to Mr. Morin, the MDOC based its decision on Plaintiff's history of drug diversion and her lack of candor during the application process.  (*Id.*; Morin Aff. ¶¶ 8 – 11, ECF No. 32-1.)  Mr. Morin also asserts that personally he was "concerned about having [Plaintiff] working at Mountain View because of her history of drug diversion … and because she was not honest during the interview process." (Morin Aff. ¶ 8; *see also* Revised Morin Aff. ¶¶ 8 – 11, ECF No. 40-1 (stating that Mr. Morin, rather than "the Department," withdrew Plaintiff's clearance and issued the

permanent gate stop).)  Because of the permanent "gate stop," Plaintiff was prohibited from

entering Mountain View and was unable to work.[4]  (DSMF ¶ 44.)

After the MDOC revoked Plaintiff's security clearance and issued a permanent gate

stop, Ms. Partridge believed she was obligated to terminate Plaintiff's employment

effective immediately.  (DSMF ¶ 46.)  On October 15, 2015, Ms. Partridge notified Plaintiff

that CCS was terminating her employment because her security clearance had been

revoked.  (*Id.*)  In a telephone conversation on October 15, 2014, Ms. Partridge told

Plaintiff that she could not return to the facility because "one of the guards found out

something … and went to the superintendent," and that "they found out about [her]

addiction history."  (PSAMF ¶ 79; DRS ¶ 79; Swanson Dep. at 119:9–10, 119:23.)

According to Plaintiff, Ms. Partridge told her that the "superintendent found out about [her]

drug addiction history and does not feel comfortable having [her] work there due to that."

(PSAMF ¶ 80; Swanson Dep. at 141:8–10.)  The documentation that confirmed the

termination of Plaintiff's employment states that Plaintiff was discharged because her

"[s]ecurity clearance was lost."  (DSMF ¶ 47.)  CCS has a policy and practice of

terminating employees who falsify information and/or lose their security clearance.  (*Id.* ¶

52.)

Under CCS's contract with the State of Maine in July 2016, CCS continued to

provide the services of registered nurse at night at the Mountain View facility.  (PSAMF ¶

---

[4] Mr. Morin also asserts that Plaintiff's status as a former abuser in recovery was not the reason for the gate stop, and that the MDOC has other employees in recovery for substance abuse.  (*Id.* ¶ 45; Morin Aff. ¶ 12.)

84.) The individual hired by CCS to fill the position vacated by Plaintiff had no known substance abuse issues. (*Id.* ¶ 85.)

DISCUSSION

CCS argues the record cannot support a finding that its decision to terminate Plaintiff's employment was based on Plaintiff's condition as a recovering narcotics addict. Instead, CCS contends the record establishes that the termination of Plaintiff's employment was required by Plaintiff's failure to maintain a security clearance and the MDOC's related gate stop order.

## A.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If the court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of her claims, a trial-worthy controversy exists and summary judgment must be denied to the extent there are supported claims. Unsupported claims are

properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## B.    Disability Discrimination Standard

The Americans with Disabilities Act and the Maine Human Rights Act both prohibit discrimination in employment "because of" an employee's disability, where the employee or prospective employee is qualified to perform the essential functions of the job, with or without a reasonable accommodation. 42 U.S.C. §§ 12102, 12112; 5 M.R.S. §§ 4553(8-D), 4572.[5]

Proof of disability discrimination can be direct or circumstantial. *Patten v. Wal-Mart Stores E., Inc.*, 300 F.3d 21, 24 – 25 (1st Cir. 2002); *Morissette v. Cote Corp.*, 190 F. Supp. 3d 193, 201 – 202 (D. Me. 2016). Direct proof of discrimination requires "evidence that unambiguously implicates a disability discrimination motive." *Patten*, 300 F.3d at 25. Such evidence "consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Id.* (quoting *Febres v.*

---

[5] The First Circuit has characterized the causation element of a disability discrimination case as requiring proof that disability was the "but for" cause of an adverse employment action. *Palmquist v. Shinseki*, 689 F.3d 66, 77 (1st Cir. 2012). The Maine Supreme Judicial Court (SJC) has held that "[f]ederal law guides [its] construction of the Maine Human Rights Act." *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 14, 974 A.2d 276, 281. However, the SJC has also held the Maine Human Rights Act's "because of" language requires evidence that a prohibited factor "was a substantial, even though perhaps not the only, factor." *Fuhrmann v. Staples Office Superstore E., Inc.*, 2012 ME 135, ¶ 21, 58 A.3d 1083, 1093 (whistleblower protection claim, made actionable through the MHRA). The discussion in this Recommended Decision of whether Plaintiff has raised a genuine issue as to causation would be the same under either standard.

*Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir. 2000)). Ambiguous statements do not constitute direct evidence. *Id.*

In the absence of direct evidence of discrimination, a plaintiff must prove discrimination circumstantially, by satisfying the requirements of a burden-shifting analysis. *Id.* at 24 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 – 805 (1973)). This analysis "is premised on the reality that '[o]utright admissions of impermissible [discriminatory] motivation are infrequent.'" *Ahmed v. Johnson*, 752 F.3d 490, 503 (1st Cir. 2014) (quoting *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999)).

The first step in the burden-shifting analysis is for the plaintiff to produce sufficient evidence to make a prima facie showing, i.e., evidence (1) that the plaintiff qualifies as disabled under the applicable law, (2) that she is qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) that she was subjected to an adverse employment action in whole or in part because of her disability. *Lang v. Wal-Mart Stores E.*, *L.P.*, 813 F.3d 447, 458 (1st Cir. 2016); *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48, 54. The prima facie standard imposes a "relatively light burden." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994). For example, evidence that the plaintiff performed adequately and was replaced by a person without a disability can satisfy the prima facie standard. *Id.* at 15 n.4; *Morissette*, 190 F. Supp. 3d at 203.

If the plaintiff makes a prima facie showing, the burden shifts to the defendant to produce admissible evidence that its employment decision was based on a legitimate, nondiscriminatory reason. *Hodgens*, 144 F.3d at 160 – 161. "The employer's burden of

articulating a non-discriminatory reason is only a burden of production, not a burden of persuasion; the burden of proving unlawful discrimination rests with the plaintiff at all times." *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99 (1st Cir. 2007).

If the defendant meets its burden of production, the burden returns to the plaintiff to show that the defendant's stated reason is pretextual, i.e., designed to cloak discriminatory animus. *Id.* A plaintiff may show that a stated reason is pretext for discrimination by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and [with or without additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons." *Hodgens*, 144 F.3d at 168 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

In summary, a court must deny the defendant's motion for summary judgment if the plaintiff proffers "sufficient admissible evidence, if believed, to prove by a preponderance of the evidence each essential element in a prima facie case and that the employer's justification for the challenged employment action was merely a pretext for impermissible [disability] discrimination." *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 – 92 (1st Cir. 1995). In making the necessary showings, the plaintiff "may rely upon the same evidence to establish both pretext and discrimination, provided it is adequate to enable a

rational factfinder reasonably to infer that intentional [disability]-based discrimination was a determinative factor in the adverse employment action." *Id.* at 1092.[6]

## C.   Analysis

The parties do not dispute that Plaintiff qualifies as disabled based on the fact she is recovering from narcotics addiction. *See Jones v. City of Boston*, 752 F.3d 38, 58 (1st Cir. 2014) ("Individuals who are recovering from an addiction to drugs may be disabled in the meaning of the ADA, as the statute aims to protect them from the stigma associated with their addiction."). In addition, the termination of Plaintiff's employment would plainly constitute an adverse employment action. The focus of the summary judgment motion is thus whether the record can support a finding that CCS's decision to terminate Plaintiff was because of Plaintiff's disability.

---

[6] The parties discuss at some length whether Plaintiff's discrimination claim requires her to prove there was another CCS employee without a disability who was treated differently than Plaintiff (i.e., who was not fired under similar circumstances). CCS argues that summary judgment should enter because Plaintiff has not identified any such person. (Motion at 10 – 11; Reply at 8 n.4, ECF No. 39.) Plaintiff contends that "comparator evidence" is not required to prove a claim of discriminatory discharge. (Pl.'s Opposition Mem at 15 – 16 & n.4.) Plaintiff's argument is persuasive. Even when a disparate treatment argument is made, a plaintiff is not necessarily required to demonstrate disparate treatment as part of the prima facie case. *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003). For example, courts occasionally divide the third prima facie element into the following two elements: (a) removal from a position where (b) the position remains open and is filled by someone with similar qualifications. *Rodriguez–Cuervos*, 181 F.3d at 19. The alternative language does not require "comparator" evidence. Moreover, the requirement of comparator evidence at the pretext stage is generally limited to cases in which the plaintiff attempts to prove discriminatory bias "based on comparative evidence." *Rodriguez – Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 21 (1st Cir. 1999); *see also Kosereis*, 331 F.3d at 213 ("*in disparate treatment cases*, comparative evidence is to be treated as part of the pretext analysis" (emphasis added)). Here, the parties have stipulated that Plaintiff was replaced by an individual with no known substance abuse issues. (Stipulation, ECF No. 33.) The stipulation, therefore, satisfies Plaintiff's prima facie causation showing. Consequently, summary judgment is not warranted based on the alleged failure to provide a comparator. In addition, comparator evidence is not a required component of every pretext showing. *Kosereis*, 331 F.3d at 214 ("Plaintiffs can show that an employer's stated reasons are pretextual in any number of ways. One method is to produce evidence that the plaintiff was treated differently than other similarly situated employees." (citation omitted)). Thus, while the record in this case does not contain the kind of comparator evidence that would reinforce a pretext finding, Plaintiff is not foreclosed from demonstrating pretext in another way.

### 1.    *Direct evidence*

Plaintiff argues that the record contains direct evidence of discriminatory animus. Direct evidence of discrimination is evidence that "unambiguously implicates a disability discrimination motive." *Patten*, 300 F.3d at 25.   In support of her argument, Plaintiff cites (a) Ms. Partridge's inquiry as to whether Plaintiff was taking Suboxone, which inquiry she made when she first informed Plaintiff she must leave the facility, and (b) Ms. Partridge's subsequent explanation to Plaintiff that her employment was terminated because the "superintendent found out about [her] drug addiction history and does not feel comfortable having [her] work there due to that."  (Pl.'s Opposition Mem. at 5 – 6; PSAMF ¶ 80; Swanson Dep. at 141:8–10.)

Contrary to Plaintiff's argument, a statement about Plaintiff's history is not an unambiguous declaration that Plaintiff was fired because she was disabled.[7]   Given the record evidence in this case regarding Plaintiff's diversion of drugs, the reference to Plaintiff's drug addiction history cannot be viewed as unambiguously implicating a discriminatory motive.

### 2.    *Circumstantial evidence*

In the absence of direct evidence, the Court must assess the record based on the burden-shifting analysis applicable to circumstantial evidence of discriminatory purpose. CCS contends that Plaintiff has not and cannot establish a prima facie case of disability discrimination because when the MDOC revoked her security clearance, Plaintiff was not

---

[7] Ms. Partridge hired Plaintiff despite knowledge of the asserted disability status.  While this does not rule out a finding of discrimination, it is material to the analysis.

qualified to perform the essential functions of the job. (Motion at 8 – 10.) The CCS Security Policy clearly states that anyone employed by CCS must obtain a security clearance from the MDOC.

The record, however, also includes evidence that before CCS terminated Plaintiff's employment, CCS and MDOC discussed Plaintiff's drug addiction history and that soon after that discussion, CCS terminated Plaintiff's employment. Furthermore, Plaintiff has provided evidence that during the meeting at which Ms. Partridge informed Plaintiff that Plaintiff must leave the facility, Ms. Partridge asked if Plaintiff was using Suboxone. The temporal relationship between the conversation between CCS and MDOC and the termination of Plaintiff's employment, and the discussion about Plaintiff's drug use at the time she was asked to leave the facility are sufficient to satisfy Plaintiff's burden to establish a prima facie case of disability discrimination.

CCS asserts it terminated Plaintiff's employment for a legitimate, non-discriminatory reason – the MDOC would not permit Plaintiff access to the Mountain View facility. Plaintiff maintains that CCS's argument fails because an employer cannot avoid liability for employment discrimination by deferring to third-party employment qualification determinations. (Pl.'s Opposition Mem. at 10 – 12.) In support of her argument, Plaintiff cites two cases in which courts determined that an employer could not avoid liability simply because a consulting physician determined the employee could not perform the requirements of the job. *Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000) (physical examination by contract physician, who recommended applicant lacked fitness to serve as a police officer based exclusively on HIV, although applicant had

passed physical agility test administered directly by the employer); *E.E.O.C. v. Texas Bus Lines*, 923 F. Supp. 965, 970 (S.D. Tex. 1996) (employer cannot rely on "an erroneous and clearly unsupported opinion" that the disability of obesity prevented the employee from performing the essential functions of bus driver job).  In a third case cited by Plaintiff, the plaintiff claimed disability discrimination after his employment as a court security officer was terminated when he was determined to be medically disqualified because of his diabetic condition.  The employer's hiring decision was informed by a contract between the United States Marshal Service and a medical doctor to assess whether the security officers were physically and medically qualified to perform the responsibilities of the job.  In a counterclaim, the security company alleged that the plaintiff's claim violated the terms of the collective bargaining agreement because the agreement provided that the employee would hold the employer harmless for removal decisions made by the United States Marshal.  The court held that the employer could not avoid its obligations under the ADA by entering into a collective bargaining agreement with the union and the court thus dismissed the counterclaim.  *Wise v. AKAL Sec., Inc.*, No. 5:04-cv-01142, 2005 WL 3487741, 2005 U.S. Dist. LEXIS 35241 (W.D. Tex. Dec. 21, 2005) (granting employee's motion to dismiss counterclaim for breach of the CBA's hold harmless provision).

In the *Holiday* and *Texas Bus Lines* cases cited by Plaintiff, the courts logically determined that an employer cannot rely on a third person to satisfy the employer's obligation to determine on a non-discriminatory basis whether a person can perform the essential functions of the job.  In other words, an employer cannot avoid potential liability

by relying on a third-party's assessment as to whether an employee can perform the essential functions of the job.

This case, however, is distinguishable from the circumstances underlying the authority upon which Plaintiff relies. Here, CCS did not contract with a third-party to assess whether an employee or potential employee was physically or mentally capable of performing the essential functions of the job. Instead, Plaintiff's employment was specifically contingent on Plaintiff maintaining MDOC clearance to enter the Mountain View facility. When MDOC revoked Plaintiff's clearance, Plaintiff's employment was terminated.[8] According to CCS, therefore, regardless of the merit of MDOC's decision,[9] Plaintiff became ineligible to work for CCS at Mountain View. CCS has thus proffered legitimate, non-discriminatory reasons for the termination of Plaintiff's employment, satisfying its burden of production.

Plaintiff contends CCS's stated reasons are a pretext for unlawful discrimination. Plaintiff's arguments focus on the record evidence regarding her disclosures during the

---

[8] CCS established the basis for the termination of Plaintiff's employment through the affidavits of Ms. Partridge and Mr. Morin as follows:

1.  Mr. Morin, acting on behalf of the MDOC, concluded that Plaintiff's drug diversion history and failure to disclose the same warranted withdrawal of Plaintiff's security clearance. (DSMF ¶ 44, citing Morin Aff. ¶¶ 8 – 11; *see also* Revised Morin Aff. ¶¶ 8 – 11.)

2.  After the MDOC revoked Plaintiff's security clearance and issued a permanent gate stop, Ms. Partridge was obligated to terminate Plaintiff's employment effective immediately and did so on that ground. (DSMF ¶ 46, citing Partridge Dep. at 103, ECF No. 30-1; Partridge Dep. Ex. 10, ECF No. 30-11.)

[9] CCS maintains MDOC's decision was based on Plaintiff's lack of candor in the application process rather than based on Plaintiff's addiction. The record could support such a finding.

application and interview process and her subsequent conversations with Ms. Partridge. For instance, Plaintiff cites her testimony regarding the disclosures she made during the interview[10] and Ms. Partridge's inquiry about her current drug use just before the termination of Plaintiff's employment as evidence that her employment was terminated because of her drug use and not because she withheld relevant information during the hiring process. While Plaintiff arguably has generated a disputed material fact as to whether MDOC's concern was Plaintiff's drug addiction or her alleged lack of candor, the fact remains that CCS terminated her employment because MDOC would not allow her access to the facility. Plaintiff has offered no facts or authority to suggest that CCS could have continued to employ Plaintiff at the Mountain View facility after MDOC revoked her security clearance.

The issue, therefore, is whether CCS actually made or participated in the decision to revoke Plaintiff's security clearance and did so for unlawful, discriminatory reasons. Plaintiff contends the record includes sufficient evidence to generate a factual issue regarding CCS's involvement and thus generates a question as to whether CCS's stated reason for the termination was pretextual.

Plaintiff specifically points to an email Mr. Morin sent to three individuals, including Ms. Partridge,[11] the day before Plaintiff's security clearance was revoked. The

---

[10] Plaintiff argues in part that she supplied enough "essential information about her past to CCS" to put CCS on notice it "should conduct due diligence regarding [her] background," and that Ms. Partridge could have obtained, but chose not to obtain, further information. (Pl.'s Opposition Mem. at 8.)

[11] The email was sent to Brian Castonguay, Kimberly Partridge, and Kim Robbins. Mr. Morin identified Ms. Robbins as the Health Services Coordinator for the MDOC. (Revised Morin Aff. ¶ 10, ECF No. 40-

email includes the following passage after listing a number of matters of concern to Mr.

Morin (none of them being Plaintiff's disability status):

> There are a very high number of red flags in this case. I am all for second chances but these conversations sound like the conversations we have with our offenders; minimizing, evasion, and excuses. This is obviously a person with a documented history of bad choices and she is being assigned to the night shift with no one else around. I am more concerned that most of these issues had to come out from others; not as a result of her being forthcoming with us.
>
> I am not comfortable with her at Mountain View but if the decision is made to keep her on board I would like to discuss protocols to keep a tight check on things.
>
> Let me know what your thoughts are.

(Partridge Dep. Ex. 13, ECF No. 30-14.) Plaintiff argues that the email communication

generates a factual issue as to whether Mr. Morin actually made the gate stop decision and

whether, ultimately, Plaintiff's disability status was the reason for the decision. (Pl.'s

Opposition Mem. at 13.)

Although CCS cannot be legally responsible based on agency principles for

MDOC's decision to revoke Plaintiff's security clearance, logic suggests Plaintiff could

conceivably prevail on her claim against CCS if the evidence established that CCS in some

way orchestrated the revocation for discriminatory reasons. *Cf. Ameen v. Amphenol

Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015) (discussing "cat's paw" theory of

liability in context of deciding when an employer can be liable based on the discriminatory

bias of a lower-level employee who was not a final decision maker for the employer). In

---

1.) Ms. Partridge identified Mr. Castonguay as one of her supervisors at the CCS regional office in Augusta. (Partridge Dep. at 10.)

other words, CCS cannot avoid liability if, based on Plaintiff's disability, it arranged for MDOC to deny Plaintiff access to the Mountain View facility.

Here, a fact finder could not reasonably infer from Mr. Morin's email or any other record evidence that CCS colluded with or otherwise caused MDOC to revoke Plaintiff's security clearance based on Plaintiff's disability. While a fact finder could reasonably conclude that Mr. Morin consulted with CCS before the revocation decision, the record lacks any evidence from which a fact finder could conclude that CCS, rather than Mr. Morin and others at the MDOC, made the decision to revoke Plaintiff's security clearance,[12] and the record does not contain evidence to establish that CCS's agent, Ms. Partridge, misled the MDOC, about the information Plaintiff provided during the application and interview process in order to facilitate the termination of Plaintiff's employment for unlawful reasons.[13]

In short, a fact finder could not reasonably conclude that CCS colluded with MDOC or otherwise directed MDOC's decision to revoke Plaintiff's access to the Mountain View facility based on Plaintiff's disability. The record, therefore, could not support a finding that the stated reason for the termination of Plaintiff's employment was pretextual. Accordingly, CCS is entitled to summary judgment.

---

[12] Mr. Morin stated he withdrew Plaintiff's security clearance, after consulting with Kim Robbins, the Department of Corrections Health Services Coordinator, who approved his recommendation that the MDOC withdraw Plaintiff's clearance. (Revised Morin Aff. ¶¶ 10 – 11.)

[13] While Plaintiff argues that Ms. Partridge could have performed greater "due diligence" about Plaintiff's background (Pl.'s Opposition Mem. at 8), the failure to engage in a more thorough investigation before hiring Plaintiff was not a discriminatory act and there is no evidence that Ms. Partridge attempted to manipulate the evidence presented to the MDOC based on discriminatory bias.

**CONCLUSION**

Based on the foregoing analysis, I recommend the Court grant Defendant's Motion for Summary Judgment. (ECF No. 31.)

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 1st day of August, 2017.